## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **BAHA EDDIN AL MOMANI** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:17 -CV-01034 -MAB** |
| | ) | |
| **KIMBERLY BUTLER, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Baha Eddin Al Momani, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges one Eighth Amendment claim against officials at Menand Correctional Center ("Menard"). Plaintiff maintains he was violently attacked and seriously injured by his cellmate after he repeatedly requested and was denied a cell transfer by Menard officials in 2015 (Doc. 13, p. 1; Doc. 12, pp. 1-39). Now before the Court is Defendants' motion for summary judgment (Doc. 85). For the reasons set forth below, Defendants' motion for summary judgment (Doc. 85) will be denied.

### PROCEDURAL BACKGROUND

Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. §1983 on September 25, 2017 (Doc. 1), alleging an Eighth Amendment constitutional violation against Menard officials for failing to protect him from his violent cellmate, which ultimately led to an attack on September 17, 2015 and subsequent continued harassment (*Id.*). Following a threshold review of the complaint pursuant to 28 USC § 1915A, Plaintiff

was permitted to proceed on one Eighth Amendment claim against Warden Butler, Officer Engelage, Counselor Creason, Jacqueline Lashbrook, and an unknown Placement Officer for failing to protect him from an assault by his cellmate on or around September 17, 2015, and thereafter (Doc. 13, p. 6). As part of his claim, Plaintiff brings suit against the officials who denied his requests for a cell transfer both before and after this attack (Doc. 13, p. 1).

The trial practice schedule was entered on February 5, 2018, which included an April 6, 2018 deadline for dispositive motions on the issue of exhaustion of administrative remedies and a February 1, 2019 deadline for merits-based dispositive motions (Doc. 27). Soon after, on March 21, 2018, Plaintiff was appointed counsel (Doc. 29). The Court modified the trial practice schedule numerous times throughout the case, but it is important to note that the deadline to file a dispositive motion on the issue of exhaustion – April 6, 2018 – never changed.

Plaintiff filed a series of amended complaints, with the operative complaint filed on March 22, 2019 (Doc. 74). After being appointed counsel, Plaintiff filed a motion for leave to file a second amended complaint on May 4, 2018, which was granted as it was within the timeframe allotted in the scheduling order (*See* Docs. 38, 39). In this second amended complaint, filed on May 30, 2018, Plaintiff detailed that his claim arose from his attack and subsequent harassment from his cellmate after the attack (Doc. 40, p. 2). Plaintiff filed a motion for leave to file his third amended complaint on September 20, 2018, in which Plaintiff identified Defendant John Doe as Terri Wingerter (Doc. 46). The

Court granted Plaintiff's motion and his third amended complaint was filed on September 26, 2018 (Doc. 48).

The parties jointly filed a motion for leave to file the fourth amended complaint on March 18, 2019 to replace Defendant Lashbrook with Defendant Lawrence, as he was the current acting warden (Doc. 71). In the Fourth Amended Complaint, Plaintiff does not add any additional Defendants or change his claim (Doc. 74, pp. 7-8). Defendants answered this complaint on April 4, 2019 (Doc. 75).

Defendants filed their motion for summary judgment on July 1, 2019, alleging both merits-based arguments and detailing that Plaintiff failed to exhaust administrative remedies (Docs. 85, 86). After seeking a short extension, Plaintiff filed his response in opposition to the motion for summary judgment on August 12, 2019 (Doc. 89). Defendants filed a motion for leave to file a reply on August 15, 2019, which was granted by the Court on August 19, 2019, but Defendants never filed the reply (Docs 91, 92).

## FACTUAL BACKGROUND

At all relevant times, Plaintiff was an inmate within IDOC. The allegations took place when he was housed at Menard (Doc. 85, p. 2). Plaintiff's native language is Arabic (Doc. 89, p. 5).

### I.      Defendants' Roles

Plaintiff filed this suit against a host of Defendants. Defendant Kimberly Butler was the Warden of Menard at the time of Plaintiff's allegations and is being sued in both her official and individual capacities (Doc. 74, p. 1). Defendant Engelage was a Corrections Officer at Menard assigned to Plaintiff's housing unit (*Id.* at 1-2). Defendant

Creason was a mental health official at Menard (*Id.* at 2). Defendant Wingerter was the Placement Office Supervisor at Menard (*Id.*). Defendant Rees was a Corrections Officer at Menard assigned to Plaintiff's housing unit and Defendant Smolak was the East House Lieutenant at Menard (*Id.*). Finally, Defendant Lawrence is the current Warden of Menard (*Id.*).

## II.    Plaintiff's interactions with his cellmate

Plaintiff contends that his former cellmate, Mr. Marcus Bailey, had a series of violent interactions with both Plaintiff and others while incarcerated, which Plaintiff details extend back to at least 2014 (Doc. 89-9). On December 2, 2014, Bailey assaulted a correctional officer, was sentenced to one year in segregation, and was classified as having a "high aggression level" (Docs. 90; 89-9). Despite this interaction, and Bailey's history of sexual assault and gang affiliation, Defendant Creason recommended that Bailey be double-celled with another inmate (Doc. 89-9). Defendant Butler made the final determination to adopt Defendant Creason's recommendation and place Bailey in a double cell (*Id.*).

On February 20, 2015, Bailey was reclassified from a high to low aggression level (Doc. 90). Plaintiff was placed in a cell in the part of Menard labeled as "North 2" with Bailey on May 28, 2015 (Doc. 89-16). Plaintiff's aggression level was classified as "low" (Doc. 89-11). On July 9, 2015, Correctional Counselor Meyer met with Plaintiff during her tour of the unit (Doc. 89-11). Later that day, Plaintiff sent a letter requesting to be moved and informed her that he could not say anything in front of Bailey (Doc. 89-13).

On September 1, 2015, Plaintiff spoke with Defendant Engelage, the Gallery Officer for North 2 (where Plaintiff was housed), and told him that Bailey threatened to kill him and that Plaintiff feared for his life (Doc. 86-1, p. 23). Plaintiff requested that Defendant Engelage move him (*Id.*). Plaintiff spoke to Defendant Engelage again on September 7, 2015, asking to be moved because Bailey threatened to kill him (Doc. 86-1, pp.23-24).

Bailey assaulted Plaintiff on September 17, 2015, seriously injuring him (Doc. 89-17). Plaintiff suffered fractured cheekbones, a fractured eye socket, and broken front teeth (Doc. 89-18). He required multiple corrective surgeries, spent a month in the medical unit recovering, and experienced ongoing facial numbness and severe psychological effects (*Id.*). After the assault, Plaintiff and Bailey continued to be housed in the same unit. Both were housed in Menard's East Cell House from October 29, 2015 to November 30, 2015 (Doc. 89-16). They shared the same recreation spaces and lunch times (Doc. 75, p. 10).

On November 7, 2015, Melissa Pappas checked on Plaintiff at Defendant Butler's request because of the assault, during which Melissa Pappas told Plaintiff to contact Internal Affairs ("IA") about the issues with Bailey (Doc. 89-6). On November 13, 2015, Plaintiff sent a letter to IA requesting to speak with someone about moving to another cell (Doc. 89-7). On November 25, 2015, Jacob Weatherford reported that Plaintiff described feeling depressed and fearful, having nightmares due to the assault, and that he requested a single cell out of fear of Bailey (Doc. 89-6). Soon after, on December 3, 2015, Plaintiff sent an emergency grievance to Defendant Butler requesting compensation and a transfer to another housing unit. Defendant Butler decided this grievance was not an

emergency and returned it to Plaintiff on or around December 7, 2015 (Doc. 89-2). On December 16, 2015, Plaintiff forwarded his grievance to Counselor Wood (Doc. 89-19). Wood reported that he did not receive Plaintiff's grievance (*Id.*). Plaintiff then contacted the Grievance Office regarding his grievance, which the Grievance Office did receive (*Id.*).

### III.   Plaintiff's Grievances

An inmate may grieve prison conditions with the Illinois Department of Corrections by following the grievance procedures set forth in 20 Ill. Admin. Code 504.800 *et seq.* (Doc. 85, p. 2). When Plaintiff was first incarcerated, he received Menard's prisoner's orientation manual, which explains the prison's grievance and protective custody procedures, in Spanish, a language he does not speak (Doc. 89, p. 5). The grievance procedures have not been translated for native Arabic speakers like Plaintiff (Doc. 86-5, p. 17). Generally, IDOC inmates learn of the grievance procedures through these orientation manuals (Doc. 89-1, 9). Defendant Butler testified that since they are only offered in English or Spanish, this could preclude non-native English or Spanish speaking inmates from understanding the grievance procedures (*Id.*).

While Defendants contend that Plaintiff did not file any grievances before filing his complaint, Plaintiff argues that he attempted to grieve his placement near Bailey in every way he knew how, including requesting a single cell during a wellness check on November 7, 2015 and sending a request to IA (Docs. 89-2; 89-6).

On November 1, 2015, the Administrative Review Board received Plaintiff's October 19, 2015 grievance requesting transfer to another prison, which was denied because it was received outside the allotted timeframe (Doc. 85-1, pp. 3-4). Defendants

contend that this is the only grievance Plaintiff filed relating to his housing issues and state they instructed Plaintiff to contact his correctional counselor about a possible transfer and IA with any safety concerns (Doc. 85, p. 3). Plaintiff disagrees and highlights the letters, in-person conversations, and other attempts, detailed above, he engaged in to alert officials to his complaints about Bailey.

## IV.   Plaintiff's Complaint

Plaintiff filed his complaint on September 25, 2017 (Doc. 1), which Defendants believe is untimely as it was filed more than two years after Plaintiff was attacked by his cellmate on September 17, 2015 (Doc. 85, p. 3). Plaintiff contends that his complaint is timely as his claim relates to the totality of his experiences with his cellmate, including the fight and the subsequent harassment from October 29, 2015 through November 30, 2015 (Doc. 89, p. 4).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.   *See Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7thCir. 2014) (citing FED. R. CIV. PROC. 56(a), *see also Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012)).   A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *See also Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the

light most favorable to, and draws all reasonable inferences in favor of, the nonmoving

party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011).

As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by

examining the evidence in the light reasonably most favorable to the non-moving party,

giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the

evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir.

2014). The moving party is entitled to judgment where the non-moving party "has failed

to make a sufficient showing on an essential element of her case with respect to which

she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[A]

complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Id.*

## DISCUSSION

Defendants advance five arguments that they contend entitle them to summary

judgment. Two of these arguments raise threshold issues, which if Defendants prevail,

would preclude the Court from even considering the remaining arguments. One

pertains to exhaustion and the other is predicated on the statute of limitations. The

Court will address these threshold issues first.

### I.    Exhaustion

Defendants argue that Plaintiff failed to properly exhaust his administrative

remedies before filing suit (Doc. 85, p. 9). Plaintiff argues that Defendants' exhaustion

argument is untimely, as they should have brought this argument prior to the

commencement of merits-based discovery and before the Court-ordered deadline of

April 6, 2018 (Doc. 89, pp. 13-14). Plaintiff continues that even if the Court determines that Defendants' argument is not untimely, Defendants' affirmative misconduct rendered administrative remedies unavailable to Plaintiff and he cannot be required to exhaust (Doc. 89, p. 16).

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). Exhaustion is an affirmative defense, which the defendants bear the burden of proving. *Pavey*, 663 F.3d at 903 (citations omitted).

In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). As an inmate in the IDOC, Plaintiff was required to follow the grievance process outlined in the Illinois Administrative Code. ILL. ADMIN. CODE, tit. 20, § 504.800, *et seq.* (2017). The regulations first require an inmate to attempt to resolve the dispute through his or her counselor. *Id.* at § 504.810(a). If the counselor is unable to resolve the grievance, it is sent to the grievance officer, who reports his or her findings and recommendations in writing to the Chief Administrative Officer (the warden). *Id. at* § 504.830(e). The warden then provides the inmate with a written decision on the grievance. *Id.* If the inmate is not satisfied with the warden's decision, he or she has thirty days to appeal to the Director of the IDOC by sending the grievance to the Administrative Review Board ("ARB"). *Id.* at § 504.850(a). The ARB submits a written

report of its findings and recommendations to the Director, who then makes a final determination "within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances." *Id.* at § 504.850(d), (e).

An inmate may also request that a grievance be handled as an emergency by forwarding the grievance directly to the warden. 20 ILL. ADMIN. CODE § 504.840 (2017). If the warden determines "there is a substantial risk of imminent personal injury or other serious or irreparable harm to the [inmate]," then the grievance is handled on an emergency basis, meaning the warden will expedite processing of the grievance and respond to the inmate, indicating what action shall be or has been taken. *Id.* On the other hand, if the warden determines the grievance should not be handled on an emergency basis, the inmate is notified in writing that he "may resubmit the grievance as non-emergent, in accordance with the standard grievance process." *Id.*

Though the Seventh Circuit requires strict adherence to the exhaustion requirement, *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006), an inmate is required to exhaust only those administrative remedies that are available to him. 42 U.S.C. § 1997e(a)**.** Administrative remedies become "unavailable" to prisoners when prison officials fail to respond to a properly filed grievance or when prison officials' "affirmative misconduct" thwarts a prisoner from exhausting. *E.g., Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002); *Dole*, 438 F.3d at 809.

The Seventh Circuit has consistently held that issues related to exhaustion should be resolved at the outset of the case. "If merits discovery is allowed to begin before [the resolution of the issue of exhaustion], the statutory goal of sparing federal courts the

burden of prisoner litigation until and unless the prisoner has exhausted his administrative remedies will not be achieved." *Pavey v. Conley,* 544 F.3d 739, 742 (7th Cir. 2008).

The Court agrees with Plaintiff that Defendants' assertion of the affirmative defense of failure to exhaust administrative remedies is untimely. The trial practice schedule in this case was entered on February 5, 2018 and gave Defendants a deadline to file a motion for summary judgment on the issue of exhaustion within 60 days, or by April 6, 2018 (Doc. 27). At no time did Defendants ever seek an extension. Defendants filed their motion for summary judgment on July 1, 2019, raising the issue of exhaustion fifteen months after the deadline without even an explanation for the delay (Doc. 85). Defendants missed the window to file a motion for summary judgment on the issue of exhaustion and have waived those arguments. Lastly, even if the Court were to examine the issue of exhaustion, Plaintiff offered compelling evidence in Defendant Butler's testimony that he was thwarted from exhausting since he was notified of the grievance procedures in Spanish, a language he does not speak (Doc. 89-5).    Accordingly, Defendants' exhaustion argument is untimely and, in any event, unconvincing.

## II.    Statute of Limitations

Defendants argue that Plaintiff's claim is barred by the applicable statute of limitations because his claim relates the assault on September 17, 2015, and he did not file his complaint until September 25, 2017, more than two years after the assault (Doc. 85). Plaintiff argues that his complaint is timely because of the continuing harm doctrine and that the statute of limitations was tolled because he filed grievances (Doc. 89, p. 18).

Page 11 of 23

It is well-settled that the applicable statute of limitations period for actions brought pursuant to  42 U.S.C. § 1983  is a state's period for personal injury torts. *See Kalimara v. Ill. Dept. of Corrections,* 879 F.3d 276, 277 (7th Cir. 1989). In Illinois, where the events in Plaintiff's complaint occurred, that period is two years. *See Woods v. Illinois Dept. of Children and Family Svcs.,* 710 F.3d 762, 765-766 (7th Cir. 2013); 735 ILCS § 5/13-202. Federal law governs the accrual date for § 1983 claims, which is when the plaintiff "knows or should know that his or her constitutional rights have been violated." *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004).

The events described in Plaintiff's complaint began on or around July 9, 2015, when Plaintiff sent a letter requesting to be moved and informed Correctional Counselor Meyer that he could not say anything in front of Bailey (Doc. 89-13). Bailey attacked Plaintiff on September 17, 2015 and then Plaintiff lived near Bailey in the same unit until the end of November 2015 (Doc. 89-16). Plaintiff filed suit on September 25, 2017. At first blush, it would appear that Plaintiff filed suit beyond the applicable statute of limitations. But the issue is not as straightforward as it seems. Plaintiff argues the statute of limitations was delayed by the continuing wrong doctrine and his filing of grievances (Doc. 89, pp. 18-19). Plaintiff argues the doctrine of continuing wrong applies, as his claim is not related to the September 17, 2015 assault alone; rather, his claims relate to the assault and continued exposure to and harassment from his cellmate, which continued until November 30, 2015.

When a wrong is ongoing rather than discrete, the period of limitations does not commence until the wrong ends. *See Manuel v. Cty. of Joliet, Ill.*, 903 F.3d 667, 669 (7th. Cir. 2018, (citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115–21 (2002)). Under this doctrine, the focus is on the continuing wrong, not continuing harm, as the claim accrues when the wrong ends even if it has caused a lingering injury. *Id.* (citing *United States v. Kubrick*, 444 U.S. 111 (1979)); *Delaware State College v. Ricks*, 449 U.S. 250 (1980); *Turley v. Rednour*, 729 F.3d 645, 654–55 (7th Cir. 2013) (concurring opinion).

Plaintiff has been consistent in arguing that his claims relate to ongoing risk of physical and psychological harm from his cellmate (Doc. 89, p. 19). Although Defendants seem to argue Plaintiff added a new allegation in his Fourth Amended complaint (*i.e.*, that Defendants failed to protect Plaintiff from being housed near the alleged assailant after the assault), this claim was consistently argued as part of Plaintiff's only claim in this case, dating back to his second amended complaint (Doc. 40). Plaintiff argues an ongoing wrong in the operative complaint, where he notably states that "Defendants' disregard for Al Momani's health and safety continued in the period after the fight, when, remarkably, Defendants housed Al Momani in the same housing unit as his assailant," which Plaintiff argues lasted through November 30, 2015 (Doc. 74, p. 3). As such, the doctrine of continuing wrong applies. The wrong, in this case, ended when Plaintiff was no longer housed near his cellmate, which the Court believes is at the end of November 2015. Accordingly, Plaintiff's suit, filed on September 25, 2017, is timely within the two-

year statute of limitations period. As such, the Court need not address the parties' arguments on tolling.

### III.     Eighth Amendment Failure to Protect

Defendants advance two arguments with respect to the merits of the failure to protect claim. First, they argue that two Defendants, Butler and Wingerter, lacked the direct personal involvement and knowledge necessary to prove an Eighth Amendment claim for failure to protect because they are supervisors (Doc. 85, p. 6).[1] Plaintiff disagrees and contends that although these Defendants were in supervisory roles at Menard, they also had personal knowledge of Plaintiff's issues (Doc. 89, pp. 7-8). Second, Defendants argue that Plaintiff cannot satisfy either the objective or subjective component of his failure to protect case (Doc. 85, p. 7-8).

The Eighth Amendment prohibition on cruel and unusual punishment places a duty on prison officials to protect prisoners from violence at the hands of other prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Not every harm, though, translates into "constitutional liability" for prison officials. *Id.* at 833-34, *see also Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006). To establish a violation of this right, a prisoner must demonstrate that a prison official was deliberately indifferent to an excessive risk to the prisoner's health or safety, which includes an objective and a subjective component. *Id.* First, the harm to which the prisoner was exposed must be one that is objectively serious.

---

[1] Defendants do not present similar arguments for the other five Defendants, so the Court will not address those Defendants in this section (*see* Doc. 85; Doc. 89, p. 7).

*See Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). Prison officials have a duty to "protect prisoners from violence at the hands of other prisoners." *Stewart v. Lakin,* 2018 WL 3216013 *2 (S.D. Ill. 2018) (citing *Farmer*, 511 U.S. at 833). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society'." *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). So, to succeed on a failure to protect claim, an inmate must first demonstrate, objectively, that he is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The beating of one inmate by another "clearly constitutes serious harm." *Brown v. Budz,* 398 F.3d 904, 910 (7th Cir. 2005).

Second, the prison official must have actual knowledge of the risk to the inmate as constructive knowledge is not sufficient to establish a constitutional claim. *Farmer*, 511 U.S. at 834. A plaintiff must prove prison officials were aware of a specific, impending, and substantial threat to his safety. *Pope v. Shafer,* 86 F.3d 90, 92 (7th Cir. 1996). "Conduct that simply amounts to 'mere negligence or inadvertence' is insufficient to justify the imposition of liability." *Pinkston v. Madry,* 440 F.3d 879, 889 (7th Cir. 2006) (quoting *Estate of Davis v. Johnson*, 745 F.2d 1066, 1070 (7th Cir. 1984)). To show that prison officials were aware of a specific, impending, and substantial threat to a prisoner's safety, the prisoner often shows that he complained to officials about that specific threat. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015).

The Court's focus here is on both parts of this test and whether Defendants had the requisite knowledge of a specific, substantial threat to Plaintiff's safety and then failed to act to protect him.

A. <u>Defendants Butler and Wingerter's direct involvement in and personal knowledge of the incident</u>

A supervisor can be held liable for a Section 1983 claim when the supervisor was personally involved in the wrongful conduct. *Matthews v. Cty. Of East. St. Louis,* 675 F.3d 433, 440 (7th Cir. 2015). In order to be liable, "[s]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *Sanville v. McCaughtry,*266 F.3d 724, 740 (7th Cir. 2001); *Chavez v. Ill. State Police,* 251 F.3d 612, 651 (7th Cir. 2001).

Relying on two short sections from depositions, Defendants argue that Butler and Wingerter had no direct contact and no involvement in Plaintiff's housing assignment (Doc. 85, p. 6). Defendants cite to a small portion of Plaintiff's deposition where he testified that he did not speak to Defendant Butler in person about wanting to change cells (Doc. 86-1, p. 22)[2]. Defendants then rely on a single page of Defendant Wingerter's deposition where he stated that he never recalled receiving a kite from Plaintiff about his housing in 2015 (Doc. 86-4, p. 21).

Plaintiff advances a series of specific facts to show Defendants Butler and Wingerter's involvement in the events leading up to and after his attack which bear on their actual knowledge of the threat to Plaintiff's safety. For example, Plaintiff notes Defendant Butler was responsible for making the final decision to place Bailey in a double cell after receiving information that Bailey had been in several fights, had assaulted a staff

---

[2] While Plaintiff testified to this point, it seems Defendants cherry-picked this statement, as Plaintiff also testified that Defendant Butler was aware of his situation because he sent her a grievance and she did not take action (Doc. 86-1, p. 22).

member, was on the sex offender registry, and was affiliated with a gang (Doc. 89-9, p. 5). Defendant Butler decided this on December 4, 2014, two days after Bailey assaulted a staff member (*Id. See also* Doc. 89, p. 7). Plaintiff also notes Defendant Butler knew that the general practice of double-celling in the North House at Menard could lead to an increased risk of inmate-on-inmate violence, relying on Defendant Butler's own deposition (Doc. 89-1, pp. 12-14). Defendant Butler testified that the cells where Plaintiff was housed with Bailey were too small for two adult men, but that they simply had too many inmates and were forced to house two men in each of those cells (*Id.*). Finally, Plaintiff relies on his November 7, 2015 wellness check to demonstrate that Defendant Butler had personal knowledge of his attack and harassment, which occurred while Plaintiff was still housed in the same housing unit as Bailey (Doc. 89, p. 8). Defendant Butler testified that she personally requested a wellness check on Plaintiff after the assault (Doc. 89-1, p. 22). In the records from that wellness check, it is noted that Plaintiff "reported he would like a single cell" and that he "report[ed] fear of being assaulted again" (Doc. 89-6).

As for Defendant Wingerter, Plaintiff cites to deposition testimony to support his position that Defendant Wingerter had personal knowledge of Plaintiff's safety issues. Defendant Wingerter was the Placement Office Supervisor when Plaintiff sent a letter to her office requesting a cell change out of fear of his cellmate (Doc. 86-4, p. 4, Doc. 86-1, p. 26). Defendant Wingerter testified that she reviewed all letters sent directly from inmates to the Placement Office (Doc. 86-4, p. 10). Although Defendant Wingerter testified that she does not recall receiving this letter, Plaintiff's letter stated, "I need to be moved from

this cell because this inmate he's posing a threat for me that he's going to kill me, and the aggression level is different between me and him" (Doc. 86-1, p. 26). Defendant Wingerter also testified that the letters she received from inmates were not recorded and were thrown away when they had "been taken care of" (Doc. 86-4, p. 10).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). The nonmovant, which is Plaintiff in this case, must identify record evidence to create a genuine dispute of material fact and stave off summary judgment. *Id*. Plaintiff has done just that here, as he identifies portions of the record where there are genuine issues of material fact in determining both Defendants Butler and Wingerter's personal involvement in and knowledge of Plaintiff's claims.

B.  Defendants argue that Plaintiff cannot satisfy either the objective or subjective component of his failure to protect claim

The objective prong of a failure to protect case requires a showing that the harm to which the prisoner is exposed is one that is objectively serious. *Lemmon*, 911 F.3d at 419. An inmate must demonstrate, objectively, that he is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The beating of one inmate by another "clearly constitutes serious harm." *Brown v. Budz,* 398 F.3d 904, 910 (7th Cir. 2005).

Here, Defendants' argument as to the objective prong is sparse and somewhat difficult to follow. In short, they seem to contend that in order to be objectively serious,

the plaintiff would have to be a known target or victim of his assailant and the two would have to be housed or situated together. Defendants do not, however, cite to any authority for this proposition. And Defendants also contend that all Plaintiff has done is allege that his cellmate was highly aggressive, which is insufficient to satisfy the objective prong.

Neither of Defendants' arguments are convincing. Here, Plaintiff has come forward with record evidence demonstrating he was double celled in North 2 at Menard with an inmate who had made specific threats to Plaintiff (Doc. 86-1, p. 23). Plaintiff reported specific threats on numerous occasions before he was ultimately assaulted by Bailey on September 17, 2015 (*Id.* at pp. 23-24). Plaintiff also provides evidence that Defendants were put on notice of Plaintiff's issues with his cellmate through letters he wrote to his counselor, requests for cell changes (made through letters and in-person conversations), and the actual assault (*e.g.*, Doc. 89, pp. 11-12). And even after the assault, Plaintiff and his cellmate continued to be housed in the same area of Menard and shared common areas (Doc. 89, p. 12). Plaintiff has identified evidence demonstrating multiple threats to his safety and well-being from his cellmate, which culminated in a severe attack and continued harassment. Ultimately, when considering all the evidence in the light most favorable to the nonmovant, a reasonable juror could conclude that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. *See Brown,* 398 F.3d at 911 (allegations of exposure to a heightened risk of assault, posed by a specific individual with allegedly known violent propensities is sufficient to establish a substantial risk of harm); *Randle v. Butler,* No. 16-CV-01191-NJR, 2017 WL 1035752, at *8 (S.D. Ill. Mar. 17, 2017) (multiple threats from a former cellmate after being attacked by

him satisfies the objective component of a failure to protect claim).

As for the subjective component of Plaintiff's failure to protect case, the Court has already determined there is sufficient evidence for Plaintiff's claims against Butler and Wingerter to proceed to a jury. Accordingly, the analysis with respect to the subjective component now turns to Defendants Creason, Engelage, Rees, and Smolak.[3]

Here, a plaintiff must demonstrate that prison officials were aware of a specific, impending, and substantial threat to his safety. *Pope,* 86 F.3d at 92. Defendants argue, generally, in this section that these Defendants were not put on notice that Plaintiff feared for his life because he never refused housing with his cellmate, never told Defendant Rees he was afraid, and never requested protective custody (Doc. 85, pp. 7-8). Additionally, Defendants argue that Plaintiff's letter to his counselor was insufficient to put Defendants on notice since counselors do not determine housing assignments (Doc. 85, p. 8). Defendants argue that during the assault, Plaintiff had the opportunity to ask for help, but did not (Doc. 85, p. 8).

Plaintiff, in turn, cites to specific facts which he contends is sufficient to survive summary judgment and show that Defendants were aware of a specific, impending threat. Plaintiff details that over the summer of 2015, he wrote letters to his counselor about his fear of his cellmate before the assault took place (Doc. 89, p. 12). On September 1, 2015, Plaintiff spoke with Defendant Engelage (who was a correctional officer in North

---

[3] Defendant Lawrence is the only outstanding Defendant whose interactions with Plaintiff are not examined in this section because Defendant Lawrence was added in his official capacity as the current acting warden of Menard (Doc. 71).

2 before and during the assault) and told him that Bailey threatened him and Plaintiff feared for his life (Doc. 89, p. 12). Plaintiff wrote a letter to Defendant Creason in September 2015, before the assault, asking for her help in changing cells (Doc. 89, p. 12). Defendant Creason is also the Menard official who decided to allow Bailey to be double-celled with another inmate, even after he assaulted a prison official (Doc. 89-9).

Plaintiff wrote Defendant Rees a letter on November 19, 2015 asking for a cell house change because he feared for his life since Bailey still had access to him after the assault as they were housed in the same area and shared common spaces (Doc. 89, p. 12). Plaintiff explained in his testimony that Defendant Rees directed him to write the letter so that he could pass it to Defendant Smolak (Doc. 89, p. 13). Defendant Smolak testified that he was a Lieutenant in Plaintiff's house in 2015 (Doc. 89, p. 13). Additionally, Defendant Rees testified that a request to transfer to another cell house is something he would refer to his Lieutenant, who was Defendant Smolak at the time (*Id.*).

Again here, Plaintiff has outlined specific instances where he notified each of the Defendants as to the threats and his fears of his cellmate. A reasonable juror could determine that each of the Defendants were aware, or should have been aware, of Plaintiff's safety concerns.

### IV.   Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity because the facts alleged in this case do not give rise to a Constitutional violation and they all lack actual knowledge of Plaintiff's claims (Doc. 85, p. 12). Additionally, Defendants claim that Butler and Wingerter were in supervisory positions and had no actual involvement

in Plaintiff's care (Doc. 85, p. 13). Plaintiff disagrees, arguing he has demonstrated there are disputed questions of fact and, in light of that, a grant of qualified immunity would be inappropriate at the summary judgment stage (Doc. 89, p. 20).

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct.   *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015)(citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be

established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S.Ct. 348, 350 (2014).

For the reasons stated previously, the Court finds that Defendants are not entitled to qualified immunity at this stage because there are issues of material fact as to whether Plaintiff's constitutionally protected rights were violated by each of the Defendants.

## CONCLUSION

For the above-stated reasons, Defendants' motion for summary judgment (Doc. 85) is **DENIED**.

**IT IS SO ORDERED.**

**DATED: September 30, 2020**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**